1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .      Criminal No. 1:21cr164
                              .
      vs.                     .      Alexandria, Virginia
                              .      November 2, 2021
CULLEN LATHAM ROBERTS,        .      9:00 a.m.
                              .
               Defendant.     .
                              .
. . . . . . . . . . .         .

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:              KATHERINE E. RUMBAUGH, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314


FOR THE DEFENDANT:               JAY L. STRONGWATER, ESQ.
                                 Strongwater & Associates, LLC
                                 1360 Peachtree Street, NE
                                 Suite 910
                                 Atlanta, GA 30309
                                   and
                                 JOAN C. ROBIN, ESQ.
                                 Law Office of Joni C. Robin PLLC
                                 114 North Alfred Street
                                 Alexandria, VA 22314


COURT REPORTER:                  ANNELIESE J. THOMSON, RDR, CRR
                                 (703)299-8595



(Pages 1 - 36)



COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

1           P R O C E E D I N G S

2                 (Defendant present.)

3           THE CLERK:  Criminal Case 21-164, United States of

4   America v. Cullen Latham Roberts.  Would counsel please note

5   their appearances for the record.

6           MS. RUMBAUGH:  Good morning, Your Honor.  Katherine

7   Rumbaugh for the United States.

8           THE COURT:  Good morning.

9           MR. STRONGWATER:  Good morning, Your Honor.  Jay

10  Strongwater on behalf of the defendant, Cullen Roberts, who is

11  seated behind me.

12          THE COURT:  All right.

13          MR. STRONGWATER:  Ms. Robin is my local counsel, and

14  she is in the courtroom as well.

15          THE COURT:  All right.  Good morning.

16          And again, counsel, the rule is if you're fully

17  vaccinated, when you're speaking at the lectern, you may take

18  off your mask, all right?

19          All right, Mr. Strongwater, why don't you come up to

20  the lectern.  As you know, this matter comes on for sentencing.

21  Have you had enough time yourself and with your client to go

22  over the presentence report?

23          MR. STRONGWATER:  I have, Your Honor.

24          THE COURT:  Are there any factual corrections,

25  changes, additions, or deletions you want made to the report

3

1    itself?

2              MR. STRONGWATER:  No, Your Honor.

3              THE COURT:  Then as you know, the Probation Office

4    calculated that the offense level here is a level 21.

5    Mr. Roberts has a criminal history of I, and that establishes

6    an advisory guideline range of 37 to 46 months of imprisonment.

7    He's looking at one to three years of supervised release, a

8    fine range of $15,000 to $1 million, and because there are

9    three counts of conviction, there would be a total of $300 in

10   special assessments.

11             And you're not disputing the calculations in the

12   presentence report, correct?

13             MR. STRONGWATER:  That's correct.

14             THE COURT:  All right.  Then I'll hear from the

15   United States first.

16             MS. RUMBAUGH:  Thank you, Your Honor.  I'll be very

17   brief.  I think that it's important to highlight a few things

18   in this case.  One is that the defendant was fully

19   knowledgeable of the substances that he was distributing.  He

20   was a pharmacy technician for a period of time with CVS.  He

21   had an understanding by virtue of that of the nature of

22   controlled substances, and the fact that he was distributing

23   pharmaceutical grade, legitimate opioids, amphetamines,

24   sedatives, all manner of controlled substances that are

25   potentially quite dangerous.

4

1          The other point that I think is worth highlighting is

2    that the opioid epidemic in this country didn't start with

3    fentanyl.  Drug users, opioid addicts, typically don't begin

4    their addiction with heroin or fentanyl or other street drugs.

5    They begin with prescription drugs, prescription drugs just

6    like the defendant was distributing in this case.

7          And so it's important to recognize that even though

8    they were pharmaceutical grade, legitimate prescription drugs,

9    they're still incredibly dangerous when abused.

10          And, of course, as the government pointed out in its

11    position paper, the defendant had reason to know that the pills

12    he was selling were being abused by people with drug dependency

13    issues, people with addiction issues.

14          THE COURT:  Ms. Rumbaugh, in the course of the

15    investigation, were you able to determine where these pills

16    were coming from?

17          MS. RUMBAUGH:  Yes, Your Honor.  We believe that the

18    defendant was purchasing them through another dark net

19    distributor.  In some cases, they were coming from the UK or

20    Canada.

21          THE COURT:  All right.  But all of the pills that

22    were recovered, as you said, were real pills, unlike some of

23    the other cases we've had where the individual was actually

24    manufacturing pills.

25          MS. RUMBAUGH:  Yes, Your Honor, that's correct.

5

1    These were not the so-called pressed pills that are in reality

2    fentanyl or methamphetamine.  These were actual, as I said,

3    pharmaceutical grade, legitimate prescription drugs that were

4    coming from overseas manufacturers.

5         THE COURT:  Thank you.

6         MS. RUMBAUGH:  The last thing that I wanted to point

7    out to the Court relates to the defendant's arrest for the

8    terroristic threats charge in Georgia, and on page 11 of the

9    PSR, the bottom paragraph, it notes that the defendant was

10   arrested on October 26 of 2020 on the state charges in Georgia,

11   and he was released the following day on Pretrial Services

12   supervision, but if we go to the statement of facts, which is

13   set forth on page -- beginning on page 6 and continuing on to

14   page 7, on page 7, the very last package that he sold to the

15   undercover FBI agent was mailed on October 28.

16        So that is important because he had literally gotten

17   out of jail the day before.  He was on supervision as of the

18   day before, and that did not serve to deter him from continuing

19   to engage in distributing drugs on the dark net.

20        So I think that whatever sentence the Court imposes

21   should be significant enough to send a message that this type

22   of behavior will not be tolerated and that this is -- the

23   conduct that the defendant engaged in is incredibly dangerous.

24        So for that reason, Your Honor, I think a guideline

25   sentence is appropriate in this case.

6

1           THE COURT:  All right, thank you.

2           All right, Mr. Strongwater?

3           MR. STRONGWATER:  Thank you, Your Honor.  Your Honor,

4    I just want to highlight certain points that were brought out

5    in the presentence report and the two -- and the two memoranda

6    that were submitted to the Court.  Mr. Roberts is 23 years old.

7    He is one of three children of Elizabeth and Brett Roberts.

8    They are here today from Houston to show their support and

9    their care.

10          We've also submitted letters from friends and family

11   to show that Mr. Roberts is not standing alone, and I think

12   that might have been one of the problems he had in 2020.

13          As noted in the presentence report and the Fort Worth

14   Federal Medical Center psychologist, Mr. Roberts has a

15   diagnosis of borderline personality disorder.  He suffers or

16   has low self-esteem, and he has other mental impairments.  He

17   has a history of self-harm.  He has a history of cutting

18   himself.  There is a history of suicidal ideation.

19          For the pass 11 months, he's been in custody.  He's

20   been detained at the Lovejoy, Georgia, Detention Center in the

21   Northern District of Georgia.  He's been here at the Truesdale

22   Detention Center, and in between, he's been at the Federal

23   Medical Center in Fort Worth, Texas, for the psychologist

24   evaluation.  While in transit, he has been housed at the Grady

25   County, Oklahoma, Jail, and he has been moved around quite a

7

1    bit.

2          Today he's clear-headed about what he did.  He

3    acknowledges that what he did was wrong.  He acknowledges that

4    what he did was repetitive, but he has learned over the past 11

5    months, had to come off his medication.  He has discussed with

6    the social worker at Truesdale about coping mechanisms, about

7    how to go forward, and he is looking forward to life -- a

8    constructive life, a monitored life when he gets out of

9    custody.

10          THE COURT:  Let me ask you, because you mentioned

11   when he gets out of custody, there obviously are some very

12   serious charges that have been filed against your client by the

13   state authorities in Georgia.  Do you have any understanding as

14   to whether they plan to go forward and prosecute those charges

15   when this case is finished?

16          MR. STRONGWATER:  Your Honor, I don't represent

17   Mr. Roberts in Forsyth County -- on the Forsyth County,

18   Georgia, case.  If I -- there are active discussions about how

19   that case should be resolved.  At one point, it was -- there

20   was a consideration of dismissing the charges and running any

21   period of probation concurrent with supervised release here.

22   At another point, it was discussed about reducing the charge to

23   a misdemeanor.  And I don't mean to say that these are in

24   cement.  These are messages that I've been getting from state

25   counsel.

8

1              Also, if it results in a felony indictment, Georgia

2     has something called first offender, that he would be eligible

3     for the first offender statute in Georgia.

4              But the short answer is it's pending.  I don't know

5     what the resolution would be.  I think in talking to the

6     government and talking to both the assistant district attorney

7     in Forsyth County and Mr. Roberts' attorney, we all agree that

8     the federal sentence should have a special condition of no

9     contact with a list of people or individuals as well as

10    companies which are listed in the Forsyth County case.

11             There's no objection to that.  I think the government

12    believes that it's, it's necessary --

13             MS. RUMBAUGH:  Yes, Your Honor.

14             MR. STRONGWATER:  -- and both the assistant DA and

15    the state defense attorney would incorporate that in any

16    resolution on the state case.

17             THE COURT:  All right.  Now, I don't recall that the

18    names of all those individuals and/or places are in the report.

19             MR. STRONGWATER:  They're not, Your Honor.  What we

20    would do is, sort of like a restitution order, where the

21    dollars are later submitted after the judgment is entered, if

22    you could give us ten days or so to give you a list of names or

23    defer to the probation officer to say I don't know whether --

24             THE COURT:  It ought to be reflected in the judgment

25    order.  Is it not possible to get that to us today?

9

1          MR. STRONGWATER:  I will try with -- communication is

2 difficult as far as being here in the courthouse.  I don't know

3 what Mr. Evans' schedule is, what kind of update he has from

4 the ADA.

5          THE COURT:  And does the FBI -- does your case agent

6 know, Ms. Rumbaugh?

7          MS. RUMBAUGH:  The Court's indulgence?

8          THE COURT:  Yeah.

9          MR. STRONGWATER:  And while they're talking, Your

10 Honor, I do have the Forsyth County discovery file.  I could

11 prepare a list of names.

12          THE COURT:  We try to get the judgment order out the

13 same day that we have the defendant in court.

14          MR. STRONGWATER:  I understand.

15          THE COURT:  And so -- and it really ought to be part

16 of that order, all right?

17          MR. STRONGWATER:  Yes.

18          THE COURT:  So it's all in one document.

19          So the FBI may know, so hold on a second.

20          MR. STRONGWATER:  I don't mean to talk over their

21 meeting --

22          THE COURT:  Yeah.

23          MR. STRONGWATER:  -- but if I could get access to a

24 phone, I could try to make a call.

25          THE COURT:  Ms. Rumbaugh, are you going to be able to

1   give us the names today?

2          MS. RUMBAUGH:  Not necessarily, Your Honor.  The case

3   agent has been in touch with the police detective in Georgia

4   prior to this, and so he can reach out to her today, but, you

5   know, we don't have that in our possession at this time.

6          MR. STRONGWATER:  Your Honor -- if I --

7          THE COURT:  I mean, there are a couple of, I think,

8   female victims in the Georgia case, alleged victims in the

9   Georgia case.  Obviously, they would be appropriate.

10         MR. STRONGWATER:  I think Mr. Roberts knows who he

11  was told not to have contact with, and I may have the Forsyth

12  County file here, and that may --

13         THE COURT:  All right.

14         MR. STRONGWATER:  I know it's not listed in the bond

15  papers, but collectively, we may be able to sort through it.

16  When Mr. Roberts addresses the Court, he may be able to give

17  the Court the names.

18         THE COURT:  All right, that's fine.

19         MR. STRONGWATER:  Thank you, Judge.  Thank for your

20  indulgence.

21         Judge, as far as what -- talking as about the

22  guidelines, moving away from the Forsyth case for a second, as

23  the Court noted, the guideline is 37 to 46 months.  In our

24  memo, we looked at the four cases that this Court has had

25  regarding dark web pharmaceutical sales.  In all of those

1   cases, the defendants were involved in longer periods of time,

2   selling larger quantities of pills which generated more

3   proceeds or money for the individual defendants.  In all of

4   those cases, the defendants received low guideline sentences.

5         Last night, I found a fifth case which Your Honor has

6   presided over, and that was Benjamin Burdick, and that was

7   last -- that was August of '21.  In that case, the defendant

8   was involved from April of 2019 through October '20.  He sold

9   249,000 pills.  $150,000 was taken from his home.  The

10  investigation or the search of the home also recovered gold and

11  silver bars and coins, a pill press, and the pills that

12  Mr. Burdick was selling were adulterated.  In that case, the

13  guideline was 57 to 71 months, and the Court imposed a 36-month

14  sentence on Mr. Burdick.

15        I believe in comparing Mr. Roberts' activity, the

16  length of time, the number of pills, the money generated, that

17  a guideline sentence is -- of 36 to 47 is higher than necessary

18  to meet the criteria of 3553 and also would be in line with the

19  sentences that the Court's imposed on the other five cases.

20        We spent some time about the Forsyth County case.

21  Again, that's pending, and I -- again, I wish I could give the

22  Court a report about what the final disposition will be.

23        We would note that when Mr. -- well, the government

24  has already pointed out Mr. Roberts was released on those

25  charges, so while here in Alexandria we look at the paper, the

12

1    Superior Court judge on the, on the scene evaluated the

2    situation and released Mr. Roberts.  There's a note that's in

3    my file or it may be in the presentence report that following

4    the arrest on the federal case, there was still an interest in

5    releasing Mr. Roberts on the state case.

6            I think what's important is that during the time that

7    Mr. Roberts was acting out and making these threats, and I

8    would say they were posting and they were words, he was

9    simultaneously seeking psychological counseling.  The report

10   shows that he had been at Focus Forward, where he was

11   addressing these issues of acting out of his insecurities, of

12   his anger towards other.

13           The presentence report and the medical reports also

14   show that he had sought in -- a residential program during the

15   time that this was going on and that he was turned down by the

16   facility.

17           So yes, the conduct was wrong, and yes, the conduct

18   is scary, but simultaneously or concurrently, Mr. Roberts was

19   trying to address those thoughts and those words through active

20   outpatient therapy and efforts to get into a residential

21   program to address those problems, and I think that mitigates

22   to some extent the nature of his -- of that crime.

23           I'd also point out that Mr. Roberts is here on the

24   federal charges, not to be sentenced on the Forsyth County

25   case.

13

1      So we've talked about what Mr. Roberts was doing in

2  2020.  The last 11 months of 2021, he's been in custody.

3  Mr. Roberts has spent time developing or planning a

4  constructive release plan when he gets out of custody.  As

5  we've pointed out in our memo, he's intending to return to

6  Georgia, not to Forsyth County.  He's planning to reside with

7  his father so he has day-to-day monitoring.

8      I think one of the comments in the report was that he

9  was living alone, so whatever wild thoughts were running

10  through his head went unmonitored and unabated.  His father

11  will be there on a day-to-day basis.

12      His -- he plans to resume contact and try to resume

13  counseling with those psychologists and psychiatrists who he

14  was seeing prior to his arrest.  Mr. Roberts believes that

15  rather than starting at zero to explain to medical advisors and

16  counselors what the story is, he can go back to the people who

17  are familiar with the situation and pick up from where he left

18  off.  We think that that's a constructive way of addressing

19  these continued mental health problems that Mr. Roberts

20  exhibits.

21      And the third is that Mr. Roberts has been in touch

22  with friends, there are employment opportunities in Georgia,

23  and that he would work with friends, which again have -- serves

24  a twofold purpose.  One, it's employment.  It's keeping busy.

25  And two, he has people that will monitor any type of aberrant

14

1   behavior or outrageous behavior or expressions or see that he's

2   tilting in the wrong way.

3           So he's got his father day-to-day, he has counselors

4   that are familiar with the situation, he has friends who are

5   slash employers who can also check on his mental health, just

6   make sure that he stays on course as far as his therapy.  So we

7   believe a below-guideline sentence is appropriate.

8           We pointed out in our memo that the BOP has a

9   program.  That might be a good transition from here to release.

10  That might be beneficial to Mr. Roberts and assure the Court

11  that he's just not sitting around in general population, that

12  he is getting therapy.

13          THE COURT:  The problem with the program you sent the

14  Court, though, unless I misread the paperwork, is that it all

15  seemed to be focused on a pretty high offender.

16          MR. STRONGWATER:  Yes and no.  There, there are

17  several programs.  This one looked like it was for -- there was

18  one at a USP, United States penitentiary.  The program in Terre

19  Haute is a federal correctional institution, which is a medium.

20  Terre Haute also has a satellite camp.

21          And I know that the Court can't mandate to the BOP

22  what and where someone is to do, but it was just a suggestion,

23  Judge, that Mr. Roberts wants to have continued therapy.

24          THE COURT:  Yeah.  You know, that is always a

25  problem.  I mean, this case clearly calls for that.  I had the

1    Probation Office follow up on your suggestion.  They located a

2    program called the Resolve Program that's out of Danbury.

3              MR. STRONGWATER:  Okay.

4              THE COURT:  But again, that's Connecticut, and, you

5    know, one of the factors we also look at in determining a

6    recommendation to the Bureau of Prisons is to have somebody

7    incarcerated as close to his family and support system as

8    possible.

9              So, I mean, if this were a normal case, I assume

10   you'd be recommending designation to a facility in Georgia or

11   as close to the Georgia location where your client ultimately

12   wants to be released.

13             MR. STRONGWATER:  That's true, Your Honor.  I

14   understand the 500-mile radius priority.  I can talk --

15   Mr. Roberts can address the Court as far as giving up that

16   proximity in order to get the therapy.

17             THE COURT:  All right.  All right, Mr. Roberts, come

18   on up to the lectern.

19             This is -- you've been fully vaccinated, correct?

20             THE DEFENDANT:  Yes, ma'am.

21             THE COURT:  All right.  Then you may take off your

22   mask.  And this is your chance to say anything you'd like the

23   Court to consider before sentence is imposed.  I did read your

24   very articulate letter, so I have read that very carefully, but

25   certainly if there's anything further you'd like to say, this

1    is your chance.

2         THE DEFENDANT:  Yes, Your Honor.  Thank you for that

3    opportunity.  I know I wrote in my letter a lot about, you

4    know, my past and a little bit about what I was going through,

5    but I just, you know, there's a lot of things I realized in the

6    past 11 months.  You know, when you're locked up, you only have

7    you and yourself and your thoughts a lot of times.  You know,

8    you don't have any activities to do, and I feel like I've

9    learned a lot and come far, but, you know, these past three

10   years for me have just been really difficult.  You know, I

11   haven't really felt like myself at all.

12        THE COURT:  Do you need some water?

13        THE DEFENDANT:  Sorry, I'm kind of emotional so --

14        THE COURT:  Let's get him some water, please.

15        THE DEFENDANT:  You know, ever since 2019 and the

16   incident that I had with the coworker, I've been in, like, a

17   mental prison of sorts where I've just been really lost on how

18   to recover.  You know, I've been -- I was told a lot of cliché

19   things, like time would help, but it never seemed to get any

20   better for me, and I was left with all these really intense

21   overwhelming emotions I know I couldn't handle, and it left me

22   feeling, you know, really hopeless.

23        THE COURT:  Well, have you -- have you learned from

24   the tremendous support particularly from your father that

25   you've gotten recently?  Has that helped you at all?

17

1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  Yeah.

3              THE DEFENDANT:  It's hard when, you know, people

4    believe in you and you can't believe in yourself and you punish

5    yourself and you hurt yourself and you just want to be better.

6    You know, I thought I was doing okay.  I thought I was, you

7    know, I was trying to see different therapists and, you know,

8    try out different medications and do anything that was

9    suggested to me, but as, you know, time went on, I just felt

10   like I was kind of unfixable, like I was just -- I wasn't

11   getting any better.

12             You know, on my own, I did tons of research, just

13   trying to find anything.  I mean, I would go to work, I'd come

14   back, and I'd just, I'd research just anything that I think

15   that could help me just get better, because, you know, I know I

16   was diagnosed with depression and anxiety and all these other

17   things, but I felt like there was just something else wrong.  I

18   didn't know what it was, and nobody was telling me.

19             And, you know, it kept getting worse and worse, and,

20   you know, I had friends that would tell me, you know, I should

21   be okay by now, I should have recovered, and, you know, I ended

22   up just feeling bad about feeling bad.  So I just put on a face

23   and acted like everything was okay, and, you know, when you do

24   that, it just kind of bottles up inside of you.  It gets to

25   you.

1           And, you know, I just -- I started having really

2    scary thoughts, and I was -- I was scared to, just to go out

3    because I didn't want to hurt anybody.  I didn't want to -- I

4    didn't want to hurt myself more.  I didn't want to be in a

5    situation that I would react badly to if I just stayed at home

6    and went to work and went to therapy and that's it.

7           But, you know, people think that if you just go to

8    therapy once a week, that all the other -- all the other time

9    in the week is -- you're just going to be okay, and that's just

10   not true.

11          And, you know, I -- work was the only other place I

12   had people to talk to, and, you know, I ended up venting to

13   them and saying some things I shouldn't have said, and I didn't

14   mean them, and I didn't -- never intended to follow through.  I

15   just -- I was just so mad at myself, and I was so hurt, and I

16   just -- I didn't feel like I was getting answers, you know, and

17   I knew it was serious, and I tried to get into an inpatient

18   program, and, you know, I eventually found someplace that would

19   accept me in outpatient, and I tried doing that right before I

20   got arrested, and -- but, you know, after all this work I put

21   into my mental health, you just, you feel disappointed after a

22   while that you don't get better, and, you know, I've had to

23   wake up every day and just think about what was going to get me

24   to the next day.

25          You know, I know I've made a lot of mistakes

1    recently, and I'm not proud of them.  You know, I'm really

2    sorry for the people that I impacted and people's lives I may

3    have ruined because of what I did, but I also know I'm going to

4    have to -- I'm going to have to live with these mistakes, you

5    know, for the rest of my life, and I'm going to be judged for

6    my worst moments, and that's going to be a challenge in and of

7    itself.

8            You know, I put a lot of stress on my family and

9    friends, and I didn't want to cause them -- I didn't want them

10   to ever be hurt or feel responsible, which is -- I was just

11   trying to prove I could do something on my own.

12           You know, I'm, I'm still not entirely hopeful because

13   I still hurt a lot, but, you know, my family is here, and

14   friends that have supported me the last 11 months have meant a

15   lot to me, and if they see hope, then I'm willing to fight for

16   that hope because, you know, I do want to -- I do want to help

17   people later in life.  I want to be able to have this as a

18   story that I can use to relate to people and help them in their

19   mental health journeys because I know how hard it is.

20           And I know in the last six months, I've learned about

21   this, you know, personality disorder that honestly has really

22   scared me, but it's also opened some doors in terms of

23   treatment options and more direct focus on really kind of what

24   I need, and I'm, I'm just, you know, I'm just ready to get

25   better, and I just want to do everything I can to get there,

1   and so I -- because I don't want to come back here.

2          I just want to help people.  And I know I'm better

3   than this.  I know I am.  I just, I just want the opportunity

4   to prove that to people that matter, to the Court, to

5   everybody.  I just -- I'm just really sorry, and I just really

6   regret what I did because it's not me.

7          THE COURT:  Well, Mr. Roberts, you know, you're only

8   23 years old.  You've got your whole life ahead of you, and as

9   bad as it seems right now, I can tell you that I've had people

10  stand where you're standing in much worse shape than you are,

11  if that makes you feel any better.  I had a young woman about

12  your age in court a few weeks ago who sold drugs to a friend,

13  and there was more fentanyl in the drug than she had realized,

14  and the friend died.

15         You don't have that kind of horrible event in this

16  case.  I mean, again, to your credit, and the government has

17  acknowledged this, you were not creating pills.  You were

18  selling pills that shouldn't have been sold because there was

19  no doctor checking on the, you know, the need of the actual

20  consumer for those pills, and some of them, particularly the

21  opiates, are a problem, but you don't have that kind of

22  horrible guilt for the conduct in this particular case.

23         You need to stop beating up on yourself.  You've come

24  from a difficult background.  You've got a lot of things that

25  do need to be addressed, but you now have structure both from

21

1    the courts and now from your father in particular that should

2    help you move along, but you shouldn't expect an overnight

3    recovery, all right?  You're much like some of the people we

4    have who are, for example, drug addicts.  It's almost a

5    lifelong fight that you're going to have or struggle.  You can

6    handle it, all right?

7             And in some respects, perhaps getting arrested was

8    the best thing that ever happened to you because it's forcing

9    you to have to address these issues, and it will also give you

10   structure.

11            I don't find that long prison sentences for a

12   defendant like Mr. Roberts makes any good sense.  The prisons

13   are not set up to provide the kind of mental health treatment

14   that is available in the private sector.  Some period of

15   incarceration is necessary because this type of crime, this use

16   of the internet to sell materials that are illegal or that are

17   not properly controlled is an ongoing problem, but at the same

18   time, I think in this case, the guidelines are too high.

19            This defendant is not someone who just discovered a

20   mental illness problem.  He clearly has had it for a long time

21   and was trying to deal with it before he got involved with this

22   conduct, and I think that his very significant mental illness

23   has played a major role in his involvement in the criminal

24   activity, so I'm using that under 3553(a) as a significant

25   factor for a downward departure.

1           The guidelines are properly calculated based on the

2    facts of the case, but I'm going to have a variant sentence in

3    this case of 24 months in the custody of the Bureau of Prisons,

4    that's two years, with credit for the time you've served.  So

5    you've almost served half of that sentence at this point.

6           That is -- that sentence is imposed on each of the

7    three counts, to run concurrent with each other, so the total

8    sentence is 24 months.

9           The 24 months' prison sentence will then be followed

10   by three years of supervised release, again, concurrent on all

11   three counts.  The terms and conditions of supervision are

12   first of all, all those terms that were on pages 19 through 21

13   of the presentence report.

14           Now, I assume you went over that report carefully

15   with your attorneys?

16           THE DEFENDANT:  I did.

17           THE COURT:  And did you read all those various

18   conditions, most of which will apply to you?

19           THE DEFENDANT:  I did.

20           THE COURT:  All right.  So among other things, I want

21   to make sure you understand you cannot violate any federal,

22   state, or local -- and that includes traffic -- laws while

23   you're under supervision.  Do you understand that?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  Secondly, you have to follow all the

1    conditions of supervision that are printed on the judgment

2    order, and they'll be explained to you by the Probation Office.

3    Do you understand that?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Now, there are a whole bunch of special

6    conditions, and I want you to listen very carefully.  These

7    will be written in the presentence -- in the judgment order,

8    but you must follow all of these conditions.

9              During the first year of supervision, you are going

10   to be required to be under home detention with GPS monitoring.

11   That's something that the Georgia authorities wanted, and I

12   want to make sure that's reflected in the, in the judgment

13   order.

14             You will have to be in your home at all times except

15   for the following reasons.  Those are what we call time-outs.

16   You may leave your home to look for work or to go to work.  You

17   may leave your home to attend to any educational programs that

18   are approved by the Probation Office.  You may leave your home

19   to meet with any counselors, that includes your probation

20   officer, any attorneys, any mental health counselors.

21             You may leave your home to participate in any bona

22   fide religious activities; and obviously, you may leave your

23   home to attend to any medical needs for yourself.  If you have

24   a toothache, you can go to the dentist, something like that.

25             Other than those reasons, you cannot be out of your

24

1    home for any reason unless it's been permitted by the Probation

2    Office or approved by the Court.  Do you understand that?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  The Court is going to waive the costs of

5    monitoring, so you will not have to pay for that.  Do you

6    understand that?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  All right.

9              THE DEFENDANT:  Thank you.

10             THE COURT:  Secondly, you must be drug free.  You

11   will have to submit to drug testing as directed by the

12   Probation Office and satisfactorily participate in such in or

13   out drug treatment program as directed.  You will have to waive

14   any privacy rights that you have to the drug testing and

15   treatment so the Probation Office can monitor your progress,

16   and you will have to pay the costs for the testing and

17   treatment to the extent you are able.

18             Do you understand that?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  Third, you must satisfactorily

21   participate in such mental health evaluation and treatment as

22   directed by the Probation Office.  Now, this may include the

23   taking of medication, going into any in- or outpatient

24   treatment program, and it is the Probation Office which is

25   going to determine what programs you go to, all right?  They

25

1    may approve the counselors you are currently seeing, but they

2    may find that some other program is more appropriate.

3           Do you understand that?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  You are required to pay the costs for the

6    mental health evaluation and treatment to the best you can, but

7    if you are unable to pay the costs, the Probation Office will

8    pay them.  Do you understand that?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  All right.  You have to disclose to any

11    and all of your medical doctors the fact that you have this

12    conviction on your record.  Do you understand that?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  Because it involved prescription pills,

15    so we want to make sure they know about that.

16          You are required to provide access to any and all of

17    your financial information to the Probation Office at its

18    request.  We want to make sure there are not some unexplained

19    sources of income that might suggest that you are getting back

20    involved in something clandestine.

21          Do you understand that?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  All right.  You are to make a good faith

24    effort to obtain full-time, verifiable employment.  Do you

25    understand that?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  All right.  Now, because this offense

3   involved the use of a computer, you're going to be required to

4   comply with the computer monitoring program that's administered

5   by the Probation Office, and that means you must consent to the

6   installation of computer monitoring software on any computer to

7   which you have access, and that would -- if you're working, I'm

8   not going to require that a work computer be covered.  So this

9   would be any personal computer to which you have access.

10          Do you understand that?

11          THE DEFENDANT:  I understand.

12          THE COURT:  But if you're living with your father in

13  his home and your father has a computer, we are going to ask,

14  Mr. Roberts, that you would agree with this.

15          Is there any problem for you in that respect?

16          MR. ROBERTS:  No, ma'am.

17          THE COURT:  All right, that's fine.

18          Just so you know, the software may restrict and/or

19  record any and all activity on the computer, including the

20  capture of keystrokes, application information, internet use

21  history, e-mail correspondence, and conversations, and there'll

22  be a notice placed on the computer to that effect.

23          Do you understand that?

24          THE DEFENDANT:  I understand.

25          THE COURT:  And you are not permitted to remove,

1  tamper with, reverse-engineer, or in any way circumvent the

2  software.  Do you understand that?

3           THE DEFENDANT:  I understand.

4           THE COURT:  To the extent you are able, you will be

5  required to pay the costs of that.  Do you understand?

6           THE DEFENDANT:  I understand.

7           THE COURT:  All right.  And you may not access any

8  dark net sites whatsoever on the internet, so don't -- if

9  you're in doubt, get away from the site.  Do you understand

10 that?

11          THE DEFENDANT:  I understand.

12          THE COURT:  All right.  Then lastly, you're not to

13 have any contact with any of the victims identified in the

14 Georgia case or any of the locations that were at issue.  Now,

15 as I understand it -- we don't have to put those names out on

16 the record.  As long as you give them to me today, all right?

17          MR. STRONGWATER:  Yes.

18          THE COURT:  There are three or four former coworkers,

19 right, who might be involved?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  And there was a school that was

22 mentioned.  Is there any other physical location that you're

23 aware of that may be off limits for you?

24          THE DEFENDANT:  The bond conditions, you know, set

25 the, the office that they worked at, so I assume the office

1    would be part of that location.

2            THE COURT:  All right.  So that office and the school

3    that was mentioned?

4            THE DEFENDANT:  They didn't impose anything against

5    the school.

6            THE COURT:  All right.  Do you have a copy of your

7    bond papers?

8            THE DEFENDANT:  I don't, Your Honor.

9            THE COURT:  Okay.  But do you sort of remember?

10           THE DEFENDANT:  But I do have the names if you --

11           THE COURT:  All right.  So before you leave the

12   courthouse, when you go down to the cellblock, give that

13   information to your attorney.

14           And then you can bring it up to chambers, counsel,

15   and we'll make sure it's in the judgment order today.

16           MR. STRONGWATER:  Yes, Your Honor.

17           THE COURT:  All right.  The Court finds that you are

18   unable to afford any additional costs of supervision, any costs

19   of incarceration or any of the statutory fines, but there is a

20   requirement that you pay $100 per count of conviction.  That's

21   a total of $300 of special assessments.  That money goes into a

22   federally funded victims compensation fund that is used to

23   compensate crime victims throughout the United States.

24           Do you understand all of that?

25           THE DEFENDANT:  I understand.

```
 1              THE COURT:  All right.  Ms. Rumbaugh, is there
 2    anything further you want the Court to address in the sentence?
 3              MS. RUMBAUGH:  Yes, Your Honor.  We have a consent
 4    order of forfeiture.
 5              THE COURT:  All right.  Has that been handed up yet?
 6              Now, there's no restitution in this case.
 7              MS. RUMBAUGH:  That's correct, Your Honor.
 8              THE COURT:  All right.  Has that been signed by
 9    Mr. Roberts?
10              MR. STRONGWATER:  Yes, it has, Your Honor.
11              THE COURT:  All right.  Hand it up then.
12              All right.  Under this consent order of forfeiture,
13    you've agreed to give up a money judgment in the amount of
14    $10,417, which represents the proceeds that you obtained, that
15    is, the money that you got from the sales that were involved in
16    Counts 1 and 3 of the criminal information, and that's the
17    totality of what you're forfeiting.
18              Is that your understanding?
19              THE DEFENDANT:  Yes, ma'am.
20              THE COURT:  All right.  And you have signed that,
21    correct?
22              THE DEFENDANT:  Yes, ma'am.
23              THE COURT:  All right.
24              All right.  The last thing we need to do is to figure
25    out what to recommend to the Bureau of Prisons.  Again,
```

30

1    unfortunately, I mean, the good news is I haven't given you a

2    long sentence because you've served almost, almost a year.

3              The bad news is because there's such a short amount

4    of time left, most of these programs are not going to be most

5    likely available.  The Resolve Program normally takes 12 to 14

6    months to complete.

7              THE DEFENDANT:  Your Honor, if I may?

8              THE COURT:  Yeah.

9              THE DEFENDANT:  I spoke with my counselor yesterday,

10   and we looked at different programs that the BOP offers.  There

11   are some programs out there that have DBT therapy, which is

12   recommended by my counselor, along with just emotional

13   regulation skills, better smaller court programs.  They're

14   usually not -- usually maybe 100 hours or so, but they're not

15   the 12- to 18-month programs, but there are -- and I definitely

16   intend to participate in whatever programs I can to learn

17   anything, but there are some programs out there that are

18   shorter.

19             THE COURT:  Did your counselor identify a particular

20   facility with whom that counselor -- with which that counselor

21   was familiar?

22             THE DEFENDANT:  She didn't, Your Honor.  She's not --

23   she works for the state, so she's not as familiar with the

24   federal system, so she, she knew as much as I knew at the time.

25             THE COURT:  All right.  Mr. Strongwater, did you have

1   a particular facility that you had in mind?

2                MR. STRONGWATER:  The Court had mentioned Danbury,

3   and I know that there's priority on keeping people within 500

4   miles.  Mr. Roberts is willing to waive that and follow the

5   Court's suggestion of Danbury.

6                THE COURT:  Well, I am going to recommend that he be

7   enrolled -- that the Bureau of Prisons designate the defendant

8   to Danbury FCI or such other facility where he could

9   participate in a Resolve Program or a mental health program

10  similar.  The Resolve Program appears to be excellent in terms

11  of providing among other things maintenance skills, how to cope

12  with ongoing mental health issues, so we'll include that in the

13  order.

14               But again, the Bureau of Prisons is not required to

15  follow our recommendations.  They try to.

16               I will also ask our Probation Office to intercede

17  with the Bureau of Prisons to do what you can to get

18  Mr. Roberts into a facility where he can get the kind of help

19  and treatment that he needs.

20               But, Mr. Roberts, again, I want to just tell you that

21  we're going to keep our eye on you.  I'm going to ask the

22  Probation Office even if you wind up being supervised in

23  Georgia, you'll still be responsible to this Court.  I'm going

24  to ask them to send me regular reports to see how you're doing,

25  all right?

1        THE DEFENDANT:  (Nodding head.)

2        THE COURT:  You should not be shy about asking your

3  probation officer for help.  If you think you're beginning to

4  have issues, don't wait.  Reach out to the officer.

5        Do you understand that?

6        THE DEFENDANT:  I understand.

7        THE COURT:  All right.  You also have counsel who

8  have been standing by you, and your attorneys, sometimes

9  lawyers are more social workers than they are lawyers, but it's

10  really important to keep in touch with them as well.

11        And I hope in, you know, three or four years, I get a

12  letter from you saying:  Best thing that ever happened to me

13  was I got arrested, and I've had that happened.  There have

14  been several defendants over the course of the time I've been

15  on the bench that have said that miserable year or two I had to

16  spend in prison was the best thing that ever happened to me.

17        You're so young.  You're very intelligent.  You're

18  very articulate.  You wrote an extremely good letter.  You have

19  lots going for you.

20        You've got to get these demons out of your system,

21  and it's going to take a long time.  Don't think it's going to

22  happen overnight.  And you may feel good for a couple weeks and

23  figure, ah, I've beaten it.

24        Unh-unh.  Don't fool yourself.  Be prepared for a

25  long, long voyage, but if you keep at it, you can make it.

33

1              Do you understand that?

2              THE DEFENDANT:  I understand.

3              THE COURT:  Okay.

4              THE DEFENDANT:  Thank you.

5              THE COURT:  All right, anything further on this case?

6              MR. STRONGWATER:  Yes, Your Honor.  I found the

7    Forsyth County bond papers.

8              THE COURT:  Okay.

9              MR. STRONGWATER:  Unfortunately, it just says the

10   defendant should not have any contact with anyone associated

11   within all employees of the State Farm office, which is all

12   they have.  And then following Mr. Roberts' arrest, there's two

13   names in particular that Mr. Roberts should not have contact

14   with.

15             So on the one hand, the initial bond is vague as to

16   whom --

17             THE COURT:  All right.

18             MR. STRONGWATER:  They later add two individuals with

19   whom he should not have contact.

20             THE COURT:  The State Farm office was in what, what

21   location?

22             THE DEFENDANT:  It was the Cumming branch, in

23   downtown Cumming, which is a town north of Atlanta.

24             THE COURT:  Can you spell that?

25             THE DEFENDANT:  C-u-m-m-i-n-g.

34

1           THE COURT:  Cumming.

2           THE DEFENDANT:  Correct.

3           THE COURT:  Cumming, Georgia.

4           So the State Farm office in Cumming, Georgia.

5           THE DEFENDANT:  Correct.

6           THE COURT:  All right.

7           THE DEFENDANT:  And I do understand that they might

8    have moved offices because when I worked there, they were

9    considering moving, but they might still be at that location.

10          THE COURT:  What were the -- what was the time frame

11   you worked there?

12          THE DEFENDANT:  I worked there from October 2019 to

13   October '20.

14          MR. STRONGWATER:  Judge, it was the office at 106

15   Colony Park Drive, Cumming, Georgia.

16          THE COURT:  All right.  What's the name of the --

17   spell the street name.

18          MR. STRONGWATER:  Colony, C-o-l-o-n-y, Park Drive.

19          THE COURT:  All right.  So what we can say then is

20   that you're to have no contact with anyone who was employed at

21   the State Farm office at 106 Colony Park Drive, Cumming,

22   Georgia, during the time period of October 2019 to October

23   2020.  That would cover everybody.

24          MR. STRONGWATER:  Yes.

25          THE COURT:  Okay?

35

1          MR. STRONGWATER:  And there's two individual names.

2     Do you want me to put it on the record or just share it with

3     the Court?

4          THE COURT:  Just share it with the Court, all right,

5     those two names, and that should do it then.

6          MR. STRONGWATER:  Yes.

7          THE COURT:  That's consistent with what you got from

8     the Georgia authorities?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  All right.  The last thing I do want to

11     tell you, Mr. Roberts, is that even though under your plea

12     agreement, you gave up your right to appeal both your

13     conviction and your sentence, you still have a right, even if

14     it's probably an act of futility, to notice an appeal.  If you

15     do want to notice an appeal, it must be filed within 14 days of

16     today's date.

17          You have the right to be represented by counsel on

18     any appeal.  If you cannot afford to pay for a lawyer, we will

19     appoint one for you.

20          Do you understand that?

21          THE DEFENDANT:  I understand.

22          THE COURT:  And, Mr. Strongwater, even though the

23     plea agreement, you know, involves a waiver, you still have an

24     obligation to discuss with Mr. Roberts whether he wants to

25     appeal either his convictions or his sentence, and if he does

36

1   want to, then you need to file the notice of appeal promptly.

2   All right?

3            MR. STRONGWATER:  I will.

4            THE COURT:  All right.  Anything further on this

5   case?

6            MS. RUMBAUGH:  No, Your Honor.

7            THE COURT:  Anything further from the defense?

8            MR. STRONGWATER:  No, Your Honor.

9            THE COURT:  All right.  Defendant is remanded.

10                       (Which were all the proceedings

11                        had at this time.)

12

13                 CERTIFICATE OF THE REPORTER

14      I certify that the foregoing is a correct transcript of

15   the record of proceedings in the above-entitled matter.

16

17

18            _____

                         /s/
                  Anneliese J. Thomson
19

20

21

22

23

24

25